Spallone et al., Appellants, *v.* Siegel.

Argued June 10, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Thomas E. Waters, Jr.*, with him *Jack D. Singer*, and *Waters, Fleer, Cooper & Gallager*, for appellants.

*Harry W. Reed, Jr.*, with him *Bernerd A. Buzgon*, and *Davis, Katz, Buzgon & Davis*, for appellee.

OPINION PER CURIAM, March 29, 1976:

Order of the court below granting summary judgment for defendant-lessor is reversed and the case is remanded for further proceedings.

Opinion in Support of Reversal by Cercone, J.:

While I join in Part I of Judge Spaeth's opinion, I disagree with the propriety of raising and resolving the issues to which Parts II and III are devoted.

Part II purports to make exculpatory clauses in form leases "presumptively invalid" henceforth, despite the fact that the treatment of that issue is unnecessary to the resolution of the instant case. Because we have determined that the exculpatory clause in the instant case did not apply to the part of the premises where the accident occurred, it is superfluous to discuss whether the clause was otherwise valid. Furthermore, the State Senate's Urban Affairs and Housing Committee is currently considering H.B. 600, 1975, which is a lengthy and well-considered recodification of The Landlord and Tenant Act of 1951.[1] Although the bill only purports to repeal The Landlord and Tenant Act of 1951 as it applies to counties of the second class (i.e., Allegheny County), it is expected that, if the bill is enacted into law, it will be applied statewide.[2]

As might be expected, H.B. 600 contains a provision with respect to exculpatory clauses in leases. Section 302, entitled "Prohibited Provisions in Rental Agreements," Subsection (a)(4) states that: "No rental agreement may provide that the tenant ... agrees to exculpation or limitation of any liability of the landlord arising under law or to indemnify the landlord for that liability or the costs connected therewith ...." Regardless of whether this provision is ultimately included or excluded from the bill, if the bill is enacted, it is manifestly improvident for this Court at this time to overrule the longstanding case

---

1. Act of April 6, 1951, P.L. 69, art. I, §101, 68 P.S. §250.101 *et seq.* (1965).

2. Aside from the Allegheny County Representatives who introduced the bill, H.B. 600 was co-sponsored by Representatives from Philadelphia, Mercer, Northampton, Dauphin, Montgomery and Lancaster Counties.

law of this Commonwealth which, while strictly constru-
ing such clauses, has always enforced them if they were
aptly drawn. Since the essential effect of such a decision
is to bar a landlord in most cases from shifting the risk
of loss, and hence the obligation to insure against loss, to
the tenant, that decision is, for all practical intents and
purposes, a policy judgment. In matters of public policy
we should neither preempt nor contravene the judgment
of the legislature. *A fortiori*, we should not rule on an
issue unnecessary to the resolution of a case when that
very issue is pending before our state legislature.[3]

Finally, Part III of Judge SPAETH's opinion holds
that the question of whether improper maintenance of
the rain gutters contributed to the icy condition of the
steps, was not barred by the existence of the exculpatory
clause, regardless of the efficacy of the clause. Although
this was apparently one theory of liability propounded by
appellant in the court below, it was not raised in this
appeal and may not be considered by this Court herein.
*Wiegand v. Wiegand*, 461 Pa. 482 (1975).

For the foregoing reasons I join only in the result and
*ratio decidendi* set forth in Part I of Judge SPAETH's
opinion.

WATKINS, P.J., and JACOBS, J., join in this opinion in
support of reversal.

OPINION IN SUPPORT OF REVERSAL BY PRICE, J.:

I concur in the result reached by Judge SPAETH
solely on the basis of Part III of his opinion, but wish to
note my dissent as to Parts I and II.

VAN DER VOORT, J., joins in this opinion.

OPINION IN SUPPORT OF REVERSAL BY SPAETH, J.:

This is an appeal from an order granting appellee's
motion for summary judgment in a survival and
wrongful death action brought against her.

---

3. See *Commonwealth ex rel. Finken v. Roop*, 234 Pa. Superior Ct.
155, 185 (1975) (Concurring Opinion by CERCONE, J.).

Appellee is the owner of a house in Lebanon. Appellants are the children and administrators of the estate of Carol M. Spallone, deceased, formerly appellee's tenant.

The parties agree on the following facts. On January 15, 1974, and for some time before then, the deceased and her sister, Gertrude Minning, were lessees of a second-floor apartment in appellee's house. The lease contained the following exculpatory clause:[1]

> "The party of the second part [lessee] relieves the party of the first part [lessor] from all liability by reason of any damage to any person or property in or on the demised premises caused by the negligence of the party of the first part, his agents, or any other person."

The only way to enter or leave the apartment was an outside, uncovered stairway leading from the apartment to the ground.

Appellants allege in the complaint that at approximately 6:30 a.m. on January 15, 1974, the steps of the outside stairway were covered with ice, that the decedent fell down the stairway, and that the fall ultimately caused her death on February 23, 1974. Appellants further allege in the complaint that appellee's negligence was the cause of decedent's death because she, *inter alia,* failed to clear the steps of ice, failed to maintain a proper gutter around the house, and failed to enclose the stairway.

Appellee's answer denies any negligence on her part, denies that she was in control of the stairway, and denies that the alleged fall occurred. As new matter, appellee alleges that she is in any event relieved of all liability by the exculpatory clause contained in the lease. Appellee

---

1. The tenants had originally entered into the lease with Robert and Karen Harvey. The Harveys, however, had assigned the lease to appellee nine months before the event here at issue.

thereafter filed a motion for summary judgment under Pa.R.C.P. 1035, alleging that no genuine issue of material fact exists, and that by virtue of the exculpatory clause she is entitled to judgment as a matter of law. The lower court agreed, and granted summary judgment. This appeal followed.

We have concluded: first, that the outside stairway is not "in or on the demised premises," and therefore is not covered by the exculpatory clause; second, that if the stairway is covered by the exculpatory clause, the clause is presumptively invalid; and third, that the motion for summary judgment should not have been granted.

I

The Pennsylvania Supreme Court has established standards to be used in construing an exculpatory clause: "Such standards are: (1) contracts providing for immunity from liability for negligence must be construed strictly since they are not favorites of the law; (2) such contracts 'must spell out the intention of the parties with the greatest of particularity' and show the intent to release from liability 'beyond doubt by express stipulation' and '[n]o inference from words of general import can establish it'; (3) such contracts must be construed with every intendment against the party who seeks the immunity from liability; (4) the burden to establish immunity from liability is upon the party who asserts such immunity." (Citations omitted). *Kotwasinski v. Rasner*, 436 Pa. 32, 39, 258 A.2d 865, 868 (1969), *quoting Employers L.A.C. v. Greenville B. Men's A.*, 423 Pa. 288, 292-293, 224 A.2d 620, 623 (1966).

Here the exculpatory clause relieved appellee of liability only when her negligence caused damage "in or on the demised premises." The demised premises are described in the lease as: "2nd Floor Apartment, containing four rooms and bath, being situate at 135 East Maple Street, Lebanon, Pennsylvania."

Appellee argues that since the outside stairway is the only way to enter or leave the apartment and is not used in common, it is part of the "demised premises." Even if the stairway is not "in" the demised premises, appellee further argues, it is nevertheless "on" the demised premises since it is attached "on" the side of the second floor apartment.

The fallacy of these arguments is immediately apparent when the exculpatory clause is read in conjunction with the strict standards of construction established by the Supreme Court. The specific description of the demised premises does not include the outside stairway. Nor can the word "on" be stretched to include something "outside" the premises. If appellee had intended to excuse herself from liability for negligence relating to the stairway, she should have spelled out that intention "with the greatest of particularity." The specific words of the description will not be expanded to include the stairway since the lease "must be construed with every intendment against the party who seeks ... immunity."

## II .

We do not wish, however, to base our holding solely on the doctrine of strict construction. The courts of this state have too long used this circuitous route to avoid the harsh result of exculpatory clauses in leases. *Kotwasinski v. Rasner, supra; Galligan v. Arovitch,* 421 Pa. 301, 219 A.2d 463 (1966); *Employers L.A.C. v. Greenville B. Men's A., supra.* Accordingly, we have approached the problem of the exculpatory clause directly, and we now hold that where such clauses appear in the standard form leases, they are presumptively invalid.

This holding is admittedly against the traditional weight of authority in the majority of states. In the absence of a pertinent statute, such clauses have usually been held to be valid and enforceable. Annot. 49 A.L.R.

3d 321 (1973) (collecting cases). In the past, Pennsylvania was no exception to the rule. *Bryans v. Gallagher*, 407 Pa. 142, 178 A.2d 766 (1962); *Bogutz v. Margolin*, 392 Pa. 151, 139 A.2d 649 (1958); *Cannon v. Bresch*, 307 Pa. 31, 160 A. 595 (1932).

The traditional reason given to support the enforceability of exculpatory clauses is the principle of freedom of contract. *See, e.g., Cannon v. Bresch, supra; see also*, Annot., 49 A.L.R. 3d 321 (1973); Note, *New Test for Exculpatory Clauses in Texas*, 26 *Baylor L. Rev.* 449 (1974); Comment, *Flexible Approach to the Problem of Exculpatory Clauses in the Standard Form Lease*, 1972 *Wis. L. Rev.* 520. According to that theory, a lease containing an exculpatory clause is "a contract between persons conducting a strictly private business and relates entirely to their personal and private affairs, and so cannot be opposed to public policy." *Cannon v. Bresch, supra* at 35, 160 A. at 597. The consideration inducing a tenant to accept such a clause might be the fixing of a lower rental than would otherwise be demanded by the landlord. *Cannon v. Bresch, supra;* 1972 *Wis. L. Rev., supra* at 523; 49 A.L.R. 3d, *supra* at 325.

Weighing against a broad application of the principle of freedom of contract, however, are two important principles of public policy. The first principle is that negligence should be discouraged by requiring that a wrongdoer remain liable for his own lack of care. *Employers L.A.C. v. Greenville Business Men's Association, supra; Crew v. The Bradstreet Co.*, 134 Pa. 161, 19 A. 500 (1890); *Phillips Home Furnishings, Inc. v. Continental Bank*, 231 Pa. Superior Ct. 174, 180, 331 A.2d 840 (1974); 26 *Baylor L. Rev., supra.* Lease exculpatory clauses are contrary to this principle:

> "When landlords are no longer liable for failure to observe standards of care, or for conduct amounting to negligence by virtue of an exculpatory clause in a lease, then such standards cease to exist. They are not merely 'diluted.' Negligence cannot exist in

abstraction. The exculpatory clause destroys the concept of negligence in the landlord-tenant relationship, and the majority opinion, in sustaining the validity of that clause, has given the concept of negligence in this relationship a 'judicial burial.' " *O'Callaghan v. Waller & Beckwith Realty Co.*, 15 Ill. 2d 436, 443, 155 N.E. 2d 545, 549 (1958).

The second principle is that of "protecting those in need of goods or services from being overreached by those with power to drive unconscionable bargains."[2] *Kotwasinski v. Rasner, supra; Galligan v. Arovitch, supra; Uniform Commercial Code,* Act of April 6, 1953, P.L. 3, §1-101; Reenacted October 2, 1959, P.L. 1023, §1; 12 A P.S. §1-101 *et seq.*

In time the Pennsylvania Supreme Court began to recognize the destructive effect of exculpatory clauses on these two policies and to take steps to ameliorate the severity of the *Cannon* approach. One step was the development of the doctrine of strict construction. Part I, *supra; Kotwasinski v. Rasner, supra; Galligan v. Arovitch, supra; Employers L.A.C. v. Greenville B. Men's A., supra; Morton v. Ambridge Borough,* 375 Pa. 630, 101 A.2d 661 (1954); *Perry v. Payne,* 217 Pa. 252, 66 A. 553 (1907); *Crew v. The Bradstreet Co., supra.* Another step was the practice of holding exculpatory clauses inapplicable if the conduct at issue was violative of a statute or ordinance designed for public safety. *Boyd v. Smith,* 372 Pa. 306, 94 A.2d 44 (1953).

Even these steps, however, proved inadequate to protect an overreached tenant. Accordingly, the Supreme Court took a further step and established criteria by which an exculpatory clause should be tested and, if found wanting, invalidated: "... Generally speaking, an exculpatory clause is valid if: (a) 'it does not contravene any policy of the law, that is, if it is not a matter of

---

2. *O'Callaghan v. Waller & Beckwith Realty Co., supra* at 443, 155 N.E. 2d at 548.

interest to the public or State ....' (Dilks v. Flohr Chevrolet, 411 Pa. 425, 434, 192 A.2d 682 (1963) and authorities therein cited); (b) 'the contract is between persons relating entirely to their own private affairs' (Dilks v. Flohr Chevrolet, supra, page 433); (c) 'each party is a free bargaining agent' and the clause is not in effect 'a mere contract of adhesion, whereby [one party] simply adheres to a document which he is powerless to alter, having no alternative other than to reject the transaction entirely.' (*Galligan v. Arovitch*, 421 Pa. 301, 304, 219 A.2d 463 (1966))." *Employers L.A.C. v. Greenville B. Men's A.*, *supra* at 291-292, 224 A.2d at 622-623.

One member of the Court, Mr. Justice COHEN, had already suggested, however, that thus to presume an exculpatory clause to be valid was unrealistic when the clause was in a form lease: "... The exculpatory clause is today contained in every form lease and, understandably enough, landlords are unwilling to strike therefrom that provision which strongly favors them. Thus it is fruitless for the prospective tenant of any apartment to seek a lease having no exculpatory clause. The result is that the tenant has no bargaining power and must accept his landlord's terms. There is no meeting of the minds, and the agreement is in effect a mere contract of adhesion, whereby the tenant simply adheres to a document which he is powerless to alter, having no alternative other than to reject the transaction entirely. It is obvious that analysis of the form lease in terms of traditional contract principles will not suffice, for those rules were developed for negotiated transactions, which embody the intention of both parties. *Note, The Form 50 Lease: Judicial Treatment of an Adhesion Contract*, 111 *U. Pa. L. Rev.* 1197, 1206 (1963). I do not dispute the rule that a covenant against liability for acts of negligence is valid and enforceable when entered into by private individuals in furtherance of their personal affairs. *Cannon v. Bresch*, 307 Pa. 31, 160 Atl. 595 (1932). But I do believe that such a rule necessarily assumes that each party is a

free bargaining agent, which, it is evident, a prospective tenant for an apartment being unable to bargain away an exculpatory clause, is not." *Galligan v. Arovitch, supra* at 304-5, 219 A.2d at 465.

By 1974, a majority of the Pennsylvania Supreme Court had not only adopted Mr. Justice COHEN's analysis of the landlord-tenant problem, but had gone further in its landmark opinion of *Commonwealth v. Monumental Properties, Inc.*, 459 Pa. 450, 454, 329 A.2d 812 (1974), where it held that the leasing of residences fell within the ambit of the Consumer Protection Act.[3] There the Court said (all footnotes have been omitted):

"It would be difficult indeed to imagine anything that affects the lives and welfare of the people of this Commonwealth more than housing. The Legislature has repeatedly declared that this Commonwealth suffers from a housing crisis. In 1937, 1941, 1945, 1947, 1957, 1959, 1965, 1968, and 1972 the Legislature found as a fact that a housing shortage exists. See Johnson v. Pennsylvania Housing Finance Agency, 453 Pa. 329, 332-335, 337-338, 309 A.2d 528, 530-531, 532-533 (1973).

"This Court has independently acknowledged the existence of a crisis caused by the lack of suitable housing. Klein v. Allegheny County Health Department, 441 Pa. 1, 7, 269 A.2d 647, 651 (1970); Reitmeyer v. Sprecher, 431 Pa. 284, 289-290, 243 A.2d 395, 398 (1968); cf. Galligan v. Arovitch, 421 Pa. 301, 304, 219 A.2d 463, 465 (1966). The words of Chief Justice, then Justice Jones accurately describe the economic plight of the modern residential tenant.

" 'We must recognize the fact that, since the time when *Harris* [v. Lewistown Trust Co., 326 Pa. 145, 191 A. 34 (1937)] was decided, critical changes have taken place economically and

_____

3. Unfair Trade Practices and Consumer Protection Law, Act of December 17, 1968, P.L. 1224, §§1-9, 73 P.S. §§201-1 to 201-9 (1971).

socially. Aware of such changes, we must realize further that most frequently today the average prospective tenant vis-a-vis the prospective landlord occupies a disadvantageous position. Stark necessity very often forces a tenant into occupancy of premises far from desirable and in a defective state of repair. The acute housing shortage mandates that the average prospective tenant accede to the demands of the prospective landlord as to conditions of rental, which, under ordinary conditions with housing available, the average tenant would not and should not accept.

" 'No longer does the average prospective tenant occupy a free bargaining status and no longer do the average landlord-to-be and tenant-to-be negotiate a lease on an "arm's length" basis. Premises which, under normal circumstances, would be completely unattractive for rental are now, by necessity, at a premium. If our law is to keep in tune with our times we must recognize the present day inferior position of the average tenant vis-a-vis the landlord when it comes to negotiating a lease.' Reitmeyer v. Sprecher, 431 Pa. at 289-290, 243 A.2d at 398.

"Other jurisdictions have taken judicial notice of the contemporary shortage of residential housing and the unequal bargaining power of landlords and tenants. E.g., Javins v. First National Realty Corp., 138 U.S.App.D.C. 369, 428 F.2d 1071, 1079-1080, cert. denied, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970); Green v. Superior Court, 10 Cal.3d 616, 625, 111 Cal.Rptr. 704, 709-710, 517 P.2d 1168, 1173-1174 (1974); Lemle v. Breeden, 51 Haw. 426, 428, 462 P.2d 470, 472-473 (1969); Mease v. Fox, Iowa, 200 N.W.2d 791, 794-795 (1972); Steele v. Latimer, 214 Kan. 329, 331, 521 P.2d 304, 307-309 (1974); King v. Moorehead, 495 S.W.2d 65, 71 (Mo.App. 1973); Kline v. Burns, 111 N.H. 87, 91, 276 A.2d 248, 251 (1971);

Marini v. Ireland, 56 N.J. 130, 141, 145, 265 A.2d 526, 532-533, 535 (1970); Reste Realty Corp. v. Cooper, 53 N.J. 444, 452, 251 A.2d 268, 272 (1968). See also Tucker v. Crawford, 315 A.2d 737, 741 (Del.Super. 1974); Jack Springs, Inc. v. Little 50 Ill.2d 351, 280 N.E.2d 208 (1972); Boston Housing Authority v. Hemingway, 363 Mass. 184, 293 N.E.2d 831, 841-842 (1973); Foisy v. Wyman, 83 Wash.2d 22, 26, 515 P.2d 160, 163-165 (1973); Pines v. Perssion, 14 Wis.2d 590, 596, 111 N.W.2d 409, 413 (1961).

"The housing crisis has not escaped national attention. Congress in 1949 expressed its concern over the lack of adequate housing, and an inadequate housing supply is still a serious national problem. Cases implying the significance of housing-related disputes and of attempted solutions to landlord-tenant problems have increasingly reached the Supreme Court. And executive studies have nearly unanimously found that better housing is critical to the improvement of the urban social environment.

"Against this background, the Consumer Protection Law was passed. Fully aware of the pressing need for adequate housing and the unequal economic position of landlord and tenant, the Legislature sought to end unfairness and deception in the conduct of trade or commerce. To refuse to apply the Consumer Protection law to the leasing of residential housing would needlessly insulate a great percentage of market transactions from the Law's salutary antifraud provisions. Only by exalting form over substance could such a course be pursued."
*Id.* at 474-478, 329 A.2d at 824-826.

This vigorous and comprehensive statement makes plain that the Supreme Court has left the dictates of *Cannon v. Bresch, supra,* far behind. It is true that the Court did not specifically pass upon the validity of lease exculpatory clauses, but that was because the issue was

not properly pleaded so as to state a cause of action.[4]
Here however, the issue is pleaded. In dealing with it, we
cannot ignore the clear direction of the Supreme Court in
its progression toward adequate protection of the
overreached tenant. The next logical, and very short, step
then is to presume the invalidity of lease exculpatory
clause, and we have done so today.

Such invalidation of an exculpatory clause, although
new for leases, is not otherwise new to Pennsylvania.
This court, for example, has recently held that a bank
cannot exculpate itself from the consequences of its own
negligence in the performance of its banking duties.
*Phillips Home Furnishings, Inc. v. Continental Bank,
supra.*[5] Furthermore, it is long settled law that a bailee
cannot exculpate himself from his own negligence.
*Atkins v. Racquet Garage Corp.*, 177 Pa. Superior Ct. 94,
96 n.1, 110 A.2d 767, 768 n.1 (1955). Nor can a common
carrier. *Turek v. Pennsylvania R.R. Co.*, 361 Pa. 512, 64
A.2d 779 (1949).[6]

---

4. The Commonwealth had alleged that use of lease provisions
(including exculpatory clauses) that are "illegal, unconscionable and
unconstitutional and hence unenforceable" violated the Consumer
Protection Act. The basis for that theory was that "the provisions are
unenforceable in all circumstances." After analyzing existing law, the
Commonwealth Court had "concluded that the law was settled that
these provisions were not unenforceable in all circumstances." The
Supreme Court agreed with that analysis of existing law, "and of
necessity with [the Commonwealth Court's] conclusion that this
allegation as pleaded, failed to state a cause of action." *Commonwealth
v. Monumental Properties, Inc., supra* at 483, 329 A.2d at 828.

5. *See* that opinion, 231 Pa. Superior Ct. at 181-182, 331 A.2d at
843, for a survey of cases where other courts have refused in various
contexts to enforce exculpatory clauses as contrary to public policy.

6. Also, as regards the sale of goods, the Uniform Commercial
Code, *supra*, 12A P.S. §1-101 *et seq.*, Section 2-302, permits courts to
refuse to enforce unconscionable contracts; and Section 2-719(3)
provides that the limitation of consequential damages for personal
injury from consumer goods is *prima facie* unconscionable.

Neither will Pennsylvania be alone in applying this approach to lease exculpatory clauses. At least eight other states and the District of Columbia, either by judicial decision[7] or by statute,[8] have declared lease exculpatory clauses void as against public policy.

We do not go so far as to hold that all lease exculpatory clauses are unenforceable under all circumstances. We hold only that when an exculpatory clause appears in a standard form lease, it will be presumed invalid; the presumption may be overcome if the landlord can show that the lease was not a contract of adhesion,[9] but was the result of such bargaining that it reflects the deliberate desire of both parties. 1972 *Wis. L. Rev., supra* at 531.

In appraising the parties' bargaining, the court must look to the specific factual circumstances of the case before it. The following questions will be pertinent.

First, what is the relative economic power of the parties to the lease? A superior economic position usually indicates a superior bargaining position. "The extent of superiority is usually a matter of degree. The slum

----

7. District of Columbia, New Hampshire, New Jersey, Texas, and Washington. *Tenants' Council of Tiber Island-Carrollsburg Square v. De Franceaux*, 305 F.Supp. 560 (D.D.C. 1969); *Papakalos v. Shaka*, 91 N.H. 265, 18 A.2d 377 (1941); *Kuzmiak v. Brookchester, Inc.*, 33 N.J. Super. 575, 111 A.2d 425 (1955); *Crowell v. Housing Authority of the City of Dallas*, 495 S.W.2d 887 (Tex. 1973); *McCutcheon v. United Homes Corp.*, 79 Wash. 2d 443, 486 P. 2d 1093 (1971).

8. Illinois, Maryland, Massachusetts, and New York. Ill. Ann. Stat. ch. 80, §91 (Smith-Hurd Supp. 1972); Md. Ann. Code art. 53, §40 (1972); Mass. Ann. Laws ch. 186, §15 (1955); N.Y. Gen. Obligations Law §5-321 (McKinney 1964).

9. "Contracts of adhesion are agreements in which 'one party's participation consists in his mere "adherence," unwilling and often unknowing, to a document drafted unilaterally and insisted upon by what is usually a powerful enterprise.' [Quoting Ehrenzweig, *Adhesion Contracts in the Conflicts of Laws*, 53 *Colum. L. Rev.* 1072, 1075 (1953).] One party must either accept all of the contract terms or refuse altogether." 1972 *Wis. L. Rev., supra* at 532.

landlord holds an overwhelmingly superior economic position in relation to the indigent person who may be his tenant. On the other hand, the landlord who rents to a large corporate lessee probably enjoys little or no superiority in this regard." 1972 *Wis. L. Rev., supra* at 532. *See also, Restatement (Second) of Property,* §5.6, comment e (6) at 116 (Tent. Draft No. 2, 1974).

Second, does the bargaining history show that the tenant freely and consciously accepted the exculpatory clause during negotiations for the distribution of risks in the overall lease? *O'Callaghan v. Waller & Beckwith Realty Co., supra* at 444, 155 N.E.2d at 550; *Restatement (Second) of Property, supra,* §5.6 comment e (3) at 116.

Third, does the exculpatory clause itself serve a reasonable business purpose or does it impose unreasonable liabilities on a person financially ill-equipped to assume such burdens? *Restatement (Second) of Property, supra,* §5.6, comment e (3) and (6) at 116; 1972 *Wis. L. Rev., supra* at 534-535.

Fourth, to what extent were the parties each represented by counsel in the course of negotiating the lease? *Restatement (Second) of Property, supra,* §5.6, comment e (7) at 117; Note, *The Form 50 Lease: Judicial Treatment of an Adhesion Contract,* 111 *U. Pa. L. Rev.* 1197, 1206 (1963).

Fifth, what is the availability of rental housing? When rental housing is scarce, a landlord is under little pressure to accede to a tenant's request to remove the exculpatory clause. When it is plentiful, the tenant's opportunities to shop around for a landlord who will remove the clause are increased. 1972 *Wis. L. Rev., supra* at 532-533. *See also, Commonwealth v. Monumental Properties, Inc., supra; O'Callaghan v. Waller & Beckwith Realty Co., supra; Kuzmiak v. Brookchester, Inc.,* 33 N.J. Super. 575, 111 A.2d 425 (1955); *McCutcheon v. United Homes Corp.,* 79 Wash. 2d 443, 486 P.2d 1093 (1971); Note, *Exculpatory Clauses in Standard Form Leases: A Need for Direct Judicial Action,* 28 *U. Pitt. L. Rev.* 85, 94-95 (1966).

Sixth, does competition exist among the landlords - the group that would be exempted by the clause? Even if rental housing were abundant, lack of competition would preclude the tenant from shopping around. 1972 *Wis. L. Rev., supra* at 533; *O'Callaghan v. Waller & Beckwith Realty Co., supra* (dissenting opinion). This can happen in two ways. The landlord may have a monopoly in the area. *Phillips Home Furnishings, Inc. v. Continental Bank, supra* at 181, 331 A.2d at 843. Such a monopoly, even though small, may be aggravated by the inability of the tenant to leave the locality to look for better terms. 1972 *Wis. L. Rev., supra* at 533. If no monopoly exists, the landlord and his competitors may have an oligopoly in that they all use the same terms. *O'Callaghan v. Waller & Beckwith Realty Co., supra* (dissenting opinion); 111 *U. Pa. L. Rev., supra;* 1972 *Wis. L. Rev., supra* at 533.

If, after appraisal in light of the answers to these questions, the landlord's evidence shows that the exculpatory clause was not a contract of adhesion, but was freely bargained for and accepted, the clause may stand. Without such a showing, the presumption of invalidity will stand, and the clause will be void.

## III

A summary judgment is to be entered only in the clearest case, which is to say, where there is not the slightest doubt as to the absence of a triable issue of material fact. *Kotwasinski v. Rasner, supra; Phillips Home Furnishings, Inc. v. Continental Bank, supra.* The moving party bears the burden of proving the absence of any genuine issue of material fact, and all doubt must be resolved against him. *Granthum v. Textile Machine Works*, 230 Pa. Superior Ct. 199, 202, 326 A.2d 449 (1974); *Schacter v. Albert*, 212 Pa. Superior Ct. 58, 239 A.2d 841 (1968). Where a genuine issue of material fact

exists, summary judgment is improper. *Kotwasinski v. Rasner, supra; Phillips Home Furnishings, Inc. v. Continental Bank, supra.*

In support of her motion for summary judgment, appellee filed only a brief affidavit alleging the existence of the written lease and describing the stairway. Quite apart from what has been held in Parts I and II of this opinion, the affidavit was neither sufficient nor relevant. Assuming the validity of the exculpatory clause, still, appellant's pleadings and depositions raise a factual issue not resolvable by reference to the exculpatory clause. That is, was decedent's fall caused by appellee's negligence in failing to maintain a proper gutter system around the house? The gutter system is clearly not within the exculpatory clause; if its disrepair caused the icy condition of the outside stairway, appellee might be liable. If gutters or eaves "should create a condition of danger which is obvious and exists for so long a time as to visit the owner of the premises with knowledge that some one may be hurt because of the condition, he might be visited with culpability." *Richey v. Armour*, 293 Pa. 127, 129, 141 A. 841 (1928). *See, Lemmon v. Bufalino*, 204 Pa. Superior Ct. 481, 205 A.2d 680 (1964).

In the absence of the exculpatory clause, either because of its inapplicability (Part I, *supra*), or its presumptive invalidity (Part II, *supra*), other issues also become material. First, appellee's answer disputes that decedent's fall occurred on the stairway at all. Second, even if the fall did occur on the stairway, still it must be determined whether the landlord's liability had yet arisen. [10] ". . . Liability depends to a great extent upon

---

10. "The owner of a building who leases out different parts of the building has control over those areas not specifically leased and is, therefore, liable for negligence in the maintenance of the controlled areas even though the areas are appurtenant to one or more of the leaseholds." *Portee v. Kronzek*, 194 Pa. Superior Ct. 193, 196, 166 A.2d 328, 330 (1960). *Accord, Pratt v. Scott Enterprises, Inc.*, 421 Pa. 46, 218 A.2d 795 (1966). This is particularly true when the landlord is in possession of part of the building himself.

the nature of the approach, the character of the alleged dangerous condition, and the status of the person injured. The owner's duty of care, under such circumstances, may be circumscribed further by the character of the building, the number of tenants, and the consequent burdens resulting from such occupancy.

"It may be stated as a general rule that there is no absolute duty to keep outside steps free from ice or snow at all times. Where the precipitation is recent or continuous, the duty to remove such obstruction as it forms cannot be imposed, and the dangers arising therefrom are viewed as the normal hazards of life, for which no owner or person in possession of property is held responsible. It is only when the owner or possessor, having a duty to remove snow and ice, improperly permits an accumulation thereof to remain after a reasonable length of time for removal has elapsed, that liability may arise for the unsafe and dangerous condition created."*Goodman v. Corn Exchange National Bank and Trust Co.*, 331 Pa. 587, 589-590, 200 A. 642, 643 (1938).

Because these genuine issues of material fact remain unresolved, the summary judgment cannot stand.

The order of the lower court granting summary judgment is reversed.

HOFFMAN, J., joins in Part I of this opinion.